UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------

NOEL MARTE,

                           Plaintiffs,            **MEMORANDUM & ORDER**
                                                      11-CV-840 (MKB)
           v.

BRUCE YELICH, Superintendent, Bare Hill
Correctional Facility, and ERIC T.
SCHNEIDERMAN, New York State Attorney
General,

                          Respondents.
---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

       Petitioner Noel Marte, proceeding *pro se*, brings the above-captioned petition pursuant to 28 U.S.C. § 2254, in which he alleges that he is being held in state custody in violation of his federal constitutional rights. Petitioner's claims arise from a judgment of conviction after a jury trial in the Supreme Court of New York State, Kings County, for assault and robbery in the first degree. Petitioner appealed his conviction to the Supreme Court of the State of New York, Appellate Division, Second Department, alleging that his due process and fair trial rights were violated by the trial court's admission of suggestive and unreliable pretrial identification evidence. The Appellate Division rejected Petitioner's claims, and affirmed his conviction. *People v. Marte*, 860 N.Y.S.2d 191, 192 (App. Div. 2008). The New York Court of Appeals granted Petitioner leave to appeal, *People v. Marte*, 11 N.Y.3d 833 (2008), and subsequently affirmed his conviction, *People v. Marte*, 12 N.Y.3d 583 (2009). The Supreme Court denied Petitioner's writ of certiorari. *Marte v. New York*, 559 U.S. 941 (2010). In the instant petition, Petitioner argues that the trial court's refusal to suppress pretrial identification evidence was

contrary to, and an unreasonable application of, clearly established federal law. For the reasons set forth below, the petition is denied.

I. **Background**

    a. **October 30, 2004 Incident**

In the early hours of October 30, 2004, Piotr Lewandowski, a twenty-two year-old student, was walking to his home in Brooklyn, New York. (Trial Transcript ("Trial Tr.") at 149:21–25, 150:20–24, 155:2–4.) Lewandowski noticed two men walking a half a block ahead of him. (*Id.* at 155:8–9.) He then overheard one man say to the other, "are you ready to do this?" at which point the men turned around and started walking toward Lewandowski. (*Id.* at 155:12–14.) One of the men demanded that Lewandowski hand over his money, while the other pointed a gun at him. (*Id.* at 156:14–20.) After Lewandowski surrendered his money, the gunman fired a bullet into Lewandowski's chest. (*Id.* at 157:14–16.) In shock, Lewandowski picked up his things and walked the remaining half-block to his home. (*Id.* at 158:10–12, 20–21.) His parents, who were at home, called 911, and Lewandowski was transported to Lutheran Hospital. (*Id.* at 159:9–18.)

At 2:30 p.m. that day, Detective Michael Moy ("Detective Moy") interviewed Lewandowski. (*Id.* at 272:22–272:5.) Lewandowski described the gunman as being approximately 5'7", 18 years old, and with medium-complexion and short black hair. (*Id.* at 273:14–18.) Over a period of two and a half months, Lewandowski reviewed "thousands of photos," but could not identify either of the robbers. (*Id.* at 274:1–5.) On January 15, 2005, when Detective Moy asked Lewandowski to review more photographs, Lewandowski refused, stating that he did not "feel" that he would be able to pick anyone out. (*Id.* at 274:5–11.)

Detective Moy subsequently closed the case, and asked that Lewandowski call him if any new leads developed.  (*Id.* at 274:12–19.)

### b. Identification of Petitioner

Magda Lewandowski ("Magda"), the victim's sister, had a former teacher, Lisa Schmude, with whom she shared a friendship.  (Trial Tr. At 187:3–6, 188:2–5, 223:19–24.)  Magda "liked" Petitioner, and shared this information about her feelings with Schmude.  (*Id.* at 188:16–20.)  On May 3, 2005, at Schmude's arrangement, and with Schmude present, Magda and Petitioner met outside Magda's home.  (*Id.* at 188:5–7, 242:2–5.)  While Magda and Petitioner were talking, Petitioner stated that "he shot someone on this block."  (*Id.* at 189:22–23, 228:3–4.)  According to Magda, Schumde responded, "Noel, I think you shot her brother."  (*Id.* at 228:7–8.)  Schmude recalls stating, "Her brother was shot on this block."  (*Id.* at 189:20.)

Magda testified that, after a while, she told her mother that she thought she knew who shot her brother and that she had a picture of the shooter.  (*Id.* at 228:12–18.)  Magda then approached Lewandowski, told him that she thought she knew who shot him, showed him the picture of Petitioner, and asked Lewandowski if Petitioner looked familiar.  (*Id.* at 230:8–10.)  Lewandowski testified that Magda asked him if they ever "caught the guy that shot" him, to which he responded in the negative.  (*Id.* at 164:1–2.)  Magda then asked if Lewandowski would be able to recognize the shooter, and showed him a picture of Petitioner.  (*Id.* at 164:4–9.)  According to Lewandowski, he did recognize Petitioner, but told his sister otherwise, stating "No, get this away from me."  (*Id.* at 164:13–19.)  The next day, Lewandowski told his parents about the picture and disclosed that he did recognize Petitioner as one of his attackers.  (*Id.* at 165:7–11.)

On May 26, 2005, subsequent to Lewandowski's conversation with his parents, Magda gave Lewandowski a letter. (*Id.* at 166:10–13, 181:5–6.) The letter reflected Magda's reluctance to disclose all she knew for fear that Lewandowski would be "furious" and that her father would never trust her again. (*Id.* at 168:3–5.) The letter stated, *inter alia*, that "the kid everyone thinks shot you is Noel Marte. He is about 16 or 15, a few inches taller than me now." (*Id.* at 168:14–16.) On June 2, 2005, Lewandowski and Magda went to the police station and presented the letter and photograph of Petitioner to the police. (*Id.* at 170:13–16, 181:20–23.) On June 13, 2005, Lewandowski chose Petitioner from a police lineup. (*Id.* at 170:21–171:7.)

### c. Pre-trial suppression hearing

On March 15, 2006 a hearing was conducted to determine whether or not to admit the Petitioner's pretrial identification into evidence. (Transcript of hearing dated March 15 and March 16, 2005 ("Hearing Tr.") at 1.) The Honorable Alan D. Marrus noted, "Normally, we do a hearing on alleged police misconduct, on the way they conduct a lineup and a photographic identification," but this case "has to do with a civilian who may have engaged in some conduct that creates a problem here in this case, the sister of the victim." (*Id.* at 3:2–9.)

Detective Moy testified that from October of 2004 to May of 2005, he showed Lewandowski "hundreds of photos" from the police department's photograph manager. (*Id.* at 12:20.) None of these photographs were of Petitioner. (*Id.* at 16:8–9.) Detective Steven Bacci ("Detective Bacci") testified about his conversations with Lewandowski and Magda on June 2, 2005. (*Id.* at 25:16–28:9.) Lewandowski stated that he now knew the identity of his shooter, and disclosed that Magda had shown him a photograph of Petitioner. (*Id.* at 26:14–17.) Magda recounted to Detective Bacci that she met Petitioner, and that the Petitioner told her, "I think I shot somebody on this block." (*Id.* at 27:2–14.) Justice Marrus concluded that, because

4

the police were not involved in the showing of the photograph to Lewandowski or the writing of the letter, Petitioner suffered no due process violation. (*Id.* at 44:4–19.) Justice Marrus also stated that the jury should and would determine the reliability of the pretrial identification at issue. (*Id.* at 44:4–19.)

### d. Trial

Petitioner's trial began on March 20, 2006. (Trial Tr. at 1.) The state called six witnesses: Lewandowski, Magda, Schmude, Doctor Ruben Toribo, who treated Lewandowski at Lutheran Medical Center, Officer Thomas Kukla, the first officer on the scene, and Detective Moy. Petitioner called just one witness, his aunt, Carmen Pena. At the trial, Lewandowski identified Petitioner as one of his attackers. (*Id.* at 155:18–22.) Petitioner was found guilty of assault in the first degree, (*id.* at 353:21–24), and robbery in the first degree, (*id.* 353:25–354:2). On April 19, 2006, Petitioner was sentenced to the maximum extent possible, 3.5–10 years per count, to be served consecutively. (Sentencing Transcript dated April 19, 2006 ("Sentencing Tr.") at 10:17–19.)

### e. Post-trial litigation

#### i. Appellate Division

Petitioner appealed to the Supreme Court of the State of New York, Appellate Division, Second Department. *Marte*, 860 N.Y.S.2d at 191. Petitioner raised the following claims: (1) the sentencing court violated New York Penal Law § 70.25(2) by imposing consecutive sentences, (2) the trial court improperly made a factual finding that the assault and robbery were separate and distinct acts, and (3) the trial court erred in refusing to suppress the identification made by Lewandowski on the grounds that it was unreliable as a result of an unduly suggestive pretrial identification procedure. *Id.* The Appellate Division rejected Petitioner's first claim on the

ground that Petitioner's convictions were based on "separate and distinct acts," and thus the trial court did not err when it imposed consecutive sentences as opposed to concurrent sentences. *Id.* The Appellate Division rejected Petitioner's second claim as it was unpreserved for appellate review. *Id.* Finally, the Appellate Division rejected Petitioner's third claim for lack of police involvement in the presentation of Petitioner's photograph to Lewandowski. *Id.*

### ii. New York Court of Appeals

On October 1, 2008, the New York Court of Appeals granted Petitioner leave to appeal the Appellate Court's decision. *Marte*, 11 N.Y.3d at 833. On June 11, 2009, the New York Court of Appeals affirmed Petitioner's conviction noting that "[n]o authority in our Court, and none in the United States Supreme Court, gives any support to defendant's theory that rules authorizing suppression of eyewitness evidence tainted by suggestion should be applied when the suggestion did not come from law enforcement." *Marte*, 12 N.Y.3d at 587–88. On February 22, 2010, the Supreme Court denied Petitioner's writ of certiorari. *Marte*, 559 U.S. at 941.

### f. Instant petition

Petitioner timely filed the instant petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting that the trial court's refusal to suppress the identification evidence was contrary to and an unreasonable application of clearly established federal law. (Pet. 18.) Respondents argue that the state courts' refusal to suppress the pre-trial identification evidence was not contrary to, nor did it involve an unreasonable application of, Supreme Court precedent. (Resp. Opp'n Mem. 4.)

## II.     Discussion

### a. Standard of Review

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment may only be brought on the grounds that his or her custody is "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A petitioner is required to show that the state court decision, having been adjudicated on the merits, is either "contrary to, or involved an unreasonable application of, clearly established Federal law" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. ---, ---, 133 S. Ct. 1088, 1091 (2013); *Lafler v. Cooper*, 566 U.S. ---, ---, 132 S. Ct. 1376, 1390 (2012).

For the purposes of federal habeas review, "clearly established law" is defined as the "the holdings, as opposed to dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to," or an "unreasonable application of," clearly established law if the decision (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412–13. In order to establish that a state court decision is an unreasonable application, the state court decision must be "more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The decision must be "objectively unreasonable." *Id.* In addition, factual determinations made by the state court are presumed to be correct, and the petitioner bears the

7

burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). For the reasons discussed below, the petition for writ of habeas corpus is denied.

### b. The petition is without merit

The admission of pretrial identification evidence was neither contrary to, nor an unreasonable application of, clearly established federal law. The Supreme Court has long recognized the danger of false or erroneous identification evidence. *See Neil v. Biggers*, 409 U.S. 188, 198, (1972) ("[T]he primary evil to be avoided is a very substantial likelihood of irreparable misidentification . . . which violates a defendant's right to due process . . . ." (citation and internal quotation marks omitted)). A pretrial identification will only be suppressed if it is found to be so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). However, the essential element that the court must determine is the reliability of the identification evidence. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) ("reliability is the linchpin in determining the admissibility of identification testimony"). Therefore, even if an identification procedure is found to be unduly suggestive, a pretrial identification may nevertheless be admitted so long as other factors indicate the identification's reliability. *See Biggers*, 409 U.S. at 199 (establishing a "totality of the circumstances" test for the admissibility of reliable identification evidence "even though the confrontation procedure was suggestive"). In assessing reliability, courts are required to weigh "the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199–200; *see also Manson*, 432 U.S. at 114 (repeating these factors).

Petitioner argues that the pretrial identification at issue here "could not be more tainted by suggestion" as it was based, *inter alia*, on Lewandowski's family members' suggestions and involved a single photograph of a young Latino male, generally resembling Lewandowski's earlier description of the shooter. (Pet. 21–22.) Moreover, Petitioner argues that it is constitutionally irrelevant whether or not a law enforcement official or a civilian is responsible for the suggestive identification that led to his identification by Lewandowski. (*Id.* at 22.) Respondents assert that the state courts' requirement of state action was not contrary to Supreme Court precedent and reasonable in light of said precedent. (Resp. Opp'n Mem. 5.) The Court agrees with Respondents. For the reasons discussed below, the Court finds that it was neither contrary to, nor an unreasonable application of, clearly established federal law for the state courts to deem admissible allegedly suggestive pretrial identification testimony where such suggestion was the result of private-actor conduct.

All Supreme Court cases addressing suggestive pretrial identifications, at the time of Petitioner's conviction and appellate litigation, involved police conduct or *mis*conduct.[1] *See*

---

[1] Petitioner cites to several Courts of Appeals cases where pretrial identification evidence was deemed inadmissible although the suggestive conduct did not result from police action. *See Dunnigan v. Keane*, 137 F.3d 117, 128 (2d Cir. 1998); *United States v. Bouthot*, 878 F.2d 1506, 1516 (1st Cir. 1989); *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986). However, caselaw from the Courts of Appeals does not constitute "clearly established federal law" for purposes of habeas relief. *See Renico v. Lett*, 559 U.S. 766 (2010) (finding that the Sixth Circuit erred in relying on its own constitutional three-factor test concerning whether a trial judge exercises sound discretion in declaring a mistrial where Supreme Court precedent articulated no such test); *see also Williams v. Taylor*, 529 U.S. 362, 365 (2000) (stating that clearly established federal law "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision"). Therefore, even if the "[trial] court plainly ignored the holding of *Dunnigan v. Keane*, which explicitly supported [Petitioner]'s position," (Pet. 11 n.6), such disregard of Second Circuit caselaw alone would not warrant habeas relief. Furthermore, in *Perry v. New Hampshire,* 565 U.S. ---, ---, 132 S. Ct. 716, 730 (2012), the Supreme Court abrogated these cases and held that due process does not require a preliminary judicial inquiry into the reliability of eyewitness identification, when the identification was not

*Manson*, 432 U.S. at 99 ("This case presents the issue as to whether the Due Process Clause of the Fourteenth Amendment compels the exclusion, in a state criminal trial, apart from any consideration of reliability, of pretrial identification evidence obtained by a police procedure that was both suggestive and unnecessary."); *Biggers*, 409 U.S. at 188 ("The police asserted that they used the showup technique because they had difficulty in finding for a lineup other individuals generally fitting Respondents's description as given by the victim."); *Coleman v. Alabama*, 399 U.S. 1, 3 (1970) (police-conducted lineup); *Foster v. California*, 394 U.S. 440, 441 (1969) ("We granted certiorari, limited to the question whether the conduct of the police lineup resulted in a violation of petitioner's constitutional rights."); *Simmons*, 390 U.S. at 383 ("It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals."); *United States v. Wade*, 388 U.S. 218, 220 (1967) ("The question here is whether courtroom identifications of an accused at trial are to be excluded from evidence because the accused was exhibited to the witnesses before trial at a post-indictment

---

procured under unnecessarily suggestive circumstances, arranged by law enforcement. The Supreme Court stated:
> We have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers. Petitioner requests that we do so because of the grave risk that mistaken identification will yield a miscarriage of justice. Our decisions, however, turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array. When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at post-indictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

*Id.* Although the Supreme Court decided *Perry* approximately a year after Petitioner filed the instant petition, *Perry*, at the very least, serves as persuasive guidance against Petitioner's interpretation of controlling Supreme Court caselaw at the time of Petitioner's conviction and appellate litigation.

lineup conducted for identification purposes without notice to and in the absence of the accused's appointed counsel . . . . Fifteen days later an FBI agent, without notice to Wade's lawyer, arranged to have the two bank employees observe a lineup made up of Wade and five or six other prisoners."); *see also Richardson v. Superintendent of Mid-Orange Corr. Facility*, 621 F.3d 196, 203 (2d Cir. 2010) ("every Supreme Court case addressing the suggestiveness of pretrial identifications in the due process context has involved police-conducted identification procedures"). The Supreme Court, at the time of Plaintiff's trial and through the entirety of his post-conviction litigation, had not addressed the viability of a due process claim based on suggestive pretrial identification caused by the actions of a private actor. Therefore, the state courts did not arrive at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts. *Bell v. Cone*, 535 U.S. 685, 686 (2002); *see also Richardson*, 621 F.3d at 203 (finding that the state courts' admission of a pretrial identification was not contrary to Supreme Court precedent where the Supreme Court had never encountered a materially indistinguishable set of facts).

The absence of any Supreme Court precedent addressing private-actor suggestiveness also requires the finding that the state courts did not unreasonably apply clearly established federal law. *Richardson*, 621 F.3d at 203 ("Given the absence of any holding from the Supreme Court addressing circumstances like these, we also conclude that the state courts did not apply clearly established law unreasonably in finding that the encounter was not suggestive."). The instant Petition bears a striking resemblance to *Carey v. Musladin*, 549 U.S. 70, 77 (2006), wherein the Supreme Court addressed the constitutional relevance of state versus private-actor action in the context of a defendant's due process right to a fair trial. In *Carey*, the petitioner shot and killed a man. *Id.* at 72. During the petitioner's trial, members of the victim's family sat

in the front row, and on some days some members of the victim's family wore buttons displaying the victim's photograph. *Id.* The Ninth Circuit, reversing the district court and remanding for issuance of the petitioner's writ of habeas corpus, held that the trial court failed to apply the constitutional test developed by the Supreme Court for determining whether a courtroom practice is so inherently prejudicial as to deprive a defendant of the right to a fair trial. *Id.* at 72. The Supreme Court vacated the Ninth Circuit's decision, noting that the caselaw cited by the Ninth Circuit involved "*state*-sponsored courtroom practices," whereas "the effect on a defendant's fair-trial rights of the *spectator* conduct . . . [was] an open question in our jurisprudence. This Court has never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial." *Id.* 75–76 (emphasis added). Given this open question, the Supreme Court held that the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law. *Id.* at 77.

Here, similarly, the Supreme Court, through its decisions in *Stovall*, *Simmons*, *Biggers* and *Manson*, had established a test for determining whether pretrial identifications were unduly suggestive and whether, despite such suggestiveness, a tainted pretrial identification could still be admitted as evidence. However, each case involved police action. Petitioner attempts to argue, as did the petitioner in *Carey*, that Supreme Court jurisprudence did not limit itself to police or state action, therefore, the due process test concerning the admission of pretrial identification evidence should apply generally, regardless of whether the suggestiveness was the result of police or private-actor conduct. (Pet. 24.) The Court does not agree. By noting that the Supreme Court had never applied traditional exclusionary rules to private-actor suggestion, Petitioner's argument supports the conclusion that the state courts' reading of federal law was at the very least reasonable. *See Ramos v. Racette*, 726 F.3d 284, 288 (2d Cir. 2013) ("Given the

12

lack of Supreme Court guidance in this area, 'fairminded jurists' could reasonably support the state court judgment. We decline to grant a writ of habeas corpus in the absence of 'clearly established Federal law' that requires it." (citation omitted)).

### III. Conclusion

For the foregoing reasons, the Court denies Petitioner's writ for habeas corpus, and the Court will not issue a certificate of appealability. *See* 28 U.S.C. § 2253. It is further certified pursuant to 28 U.S.C. § 1915(a) that any appeal would not be taken in good faith. *Coppedge v. United States*, 369 U.S. 438 (1962). The Clerk of Court is directed to close this case.

SO ORDERED:

　　　s/ MKB　　　　　
MARGO K. BRODIE
United States District Judge

Dated: May 28, 2014
　　　　Brooklyn, New York